E-FILED
Tuesday, 22 January, 2013  11:03:34 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| ALLEN D. HATTEN, ) | |
|                                      **Plaintiff,** ) | |
|    v. ) | |
| ) | Case No.  11-2177 |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, sued as Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
|                                   **Defendant.** ) | |

# REPORT AND RECOMMENDATION

In March 2004, the Social Security Administration ("SSA") determined that Plaintiff Allen D. Hatten was disabled as of August 29, 2003.  On January 22, 2008, as part of its continuing disability review, the SSA determined that Plaintiff was no longer disabled as of January 1, 2008.  Upon Plaintiff's request for reconsideration, a state agency disability hearing officer upheld this determination.  Plaintiff appealed, and, on September 8, 2010, Plaintiff, represented by counsel, appeared for a hearing before Administrative Law Judge ("ALJ") Diane Flebbe.  Plaintiff and Vocational Expert Matthew C. Lampley testified.  On October 28, 2010, ALJ Flebbe issued an unfavorable decision.  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security.

In July 2011, Plaintiff, proceeding *pro se*, filed a Complaint with this Court against Michael Astrue, Commissioner of Social Security, seeking judicial review of the ALJ's determination that Plaintiff was no longer disabled as of January 1, 2008.  In January 2012, Plaintiff filed his Motion for Summary Judgment (#17).  In May 2012, Defendant filed his Motion for an Order Which Affirms the Commissioner's Decision (#20).  Shortly thereafter, Plaintiff filed a Motion for an Order that Disaffirms the Commissioner's Decision (#21), which the Court construed as Plaintiff's response to the Commissioner's motion.  The Court mooted Plaintiff's motion (#21) and directed the Clerk to refile it as a response (#24).  For the reasons discussed below, the Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment **(#17)** be **GRANTED**,

and that Defendant's Motion for an Order Which Affirms the Commissioner's Decision **(#20)** be **DENIED**.

## I. Background

In March 2004, the SSA determined that Plaintiff was disabled as of August 29, 2003. (R. 13.) At the time of the SSA's disability determination, Plaintiff had a history of brain cancer. He had been diagnosed with a grade III astrocytoma and underwent brain surgery on October 17, 2003, as well as chemotherapy and radiation following surgery. (R. 15.) Plaintiff experienced seizures and headaches. (R. 15.) The SSA found that Plaintiff had the following medically determinable impairments: "malignant neoplasm of the brain with headaches, history of seizures, status post ankle fracture." (R. 15.) At the time, malignant neoplasms of the brain were evaluated under Listing 11.05A, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004). The SSA determined that Plaintiff's grade III astrocytoma met Listing 11.05A and that Plaintiff, therefore, was disabled. (R. 15.)

Several years later, however, the SSA determined that Plaintiff was no longer disabled as of January 1, 2008.

### 1. Summary of the Medical Evidence

The following summary of Plaintiff's medical records is not exhaustive but provides context for the arguments raised by Plaintiff.

Plaintiff had surgery for a left frontal tumor in his brain on October 17, 2003 (R. 518), followed by radiation and chemotherapy (R. 508). He experienced generalized seizures in early 2004. Plaintiff's doctors prescribed him Dilantin for seizure control. (R. 493-94).

At a follow-up in December 2004, Plaintiff's neurologist Dr. Oliver Dold reported that Plaintiff had not experienced a seizure since February 2004 and that he continued to take Dilantin. (R. 478.) Dr. Dold also reviewed an MRI from December 2004, which showed no

recurrence or progression of Plaintiff's brain tumor. (R. 478.) At an April 2005 follow-up with Dr. Dold, Plaintiff reported fatigue, significant right shoulder pain, and headaches. Plaintiff continued to take Dilantin for his seizures, and also took Vicodin four to five times a week for headaches. Dr. Dold's review of an April 2005 MRI showed that Plaintiff's brain tumor had remained stable. Dr. Dold stated that he was, overall, pleased with Plaintiff's status. (R. 476.) In October 2005, Plaintiff saw Dr. Dold again, and reported daily headaches, which were sometimes so intense it felt like his skull would split. Plaintiff also complained of some nausea and visual disturbance. Dr. Dold reviewed a recent MRI and noted some concern that Plaintiff's brain tumor had progressed, but decided to monitor the situation rather than initiate new treatment. Plaintiff continued on Dilantin and Vicodin. (R. 471.) At a follow-up on in October 2006, Dr. Dold found that Plaintiff was doing "quite well," though he noted that Plaintiff "still complain[ed] of period headaches which can be fairly severe." (R. 467.) Dr. Dold reported that Plaintiff had no further seizure activity and that Plaintiff was "contemplating on going back to school or looking for work in a light capacity environment." (R. 467.) Dr. Dold reviewed a recent MRI and concluded that Plaintiff's tumor had not progressed. Dr. Dold recommended that Plaintiff continue taking seizure medications but that Plaintiff could otherwise engage in his normal activities. (R. 467.) In March 2008, Dr. Dold saw Plaintiff again for a follow-up, where Plaintiff complained of daily headaches. Dr. Dold noted that Plaintiff "is basically just tolerating these." (R. 465.) Plaintiff had experienced no further seizures and continued to take Dilantin. Dr. Dold's report in April 2009 was similar, noting that Plaintiff complained of headaches and indicated that he was not feeling very well, but had not suffered any further seizures and continued to take Dilantin. (R. 464.) At a follow-up in May 2010, Dr. Dold again noted that Plaintiff had suffered no seizures since early 2004 and recommended that Plaintiff remain on Dilantin indefinitely. Plaintiff reported "fairly constant headache." (R. 555.) Plaintiff also reported that he had a right shoulder replacement a year prior, and that he was "doing reasonably well with this." (R. 555.) Plaintiff also told Dr. Dold that he had been recently diagnosed with a hernia. Dr. Dold concluded that Plaintiff was stable and that he was "achieving long term control" of his brain tumor. (R. 555.)

Plaintiff's general practitioner, Dr. Narain Mandhan, treated Plaintiff for his headaches, as well as for depression. In February 2007, Plaintiff presented to Dr. Mandhan with a severe headache, as well as stress and anger about family problems. (R. 327.) A counselor from a local crisis center determined that Plaintiff did not have suicidal or homicidal thoughts. Plaintiff expressed interest in taking medication for depression and to help him sleep. Dr. Mandhan prescribed him Remeron, in addition to continuing Celexa, which Plaintiff was already taking. At a follow-up in March 2007, Plaintiff reported he was sleeping better and not getting upset like before. (R. 326.) He "still ha[d] some headache off and on but it is getting better." (R. 326.) Dr. Mandhan decided to continue Plaintiff's treatment plan of Remeron, Celexa, Vicodin, and Dilantin. In December 2007, Dr. Mandhan saw Plaintiff for another follow-up. (R. 325.) Plaintiff continued to have headaches but was considering finding a job. Dr. Mandhan noted, "He is thinking about truck driving. He has some other skills but not sure if he can go to full time labor; he has not decided yet." (R. 325.) Dr. Mandhan recommended against truck driving because of Plaintiff's history of brain tumor and seizures but stated that Plaintiff could decide for himself what he wanted to do. (R. 325.) Plaintiff continued to experience headaches through the last date of records from Dr. Mandhan in June 2010, though Topamax appeared to help some with the pain. (R. 561, 540, 534, R. 522.)

In March 2009, Plaintiff saw an orthopedic surgeon, Dr. Jay Keener, regarding his right shoulder pain. (R. 448.) Plaintiff rated his average daily shoulder pain as a 9/10. He reported that his shoulder hurt at rest and bothered him at night, and that motion aggravated his pain. Dr. Keener noted that previous treatment for Plaintiff's right shoulder pain had not been successful: Plaintiff underwent two arthroscopies and two injections for pain, to no avail. (R. 448.) Dr. Keener performed a right total shoulder arthroplasty (shoulder replacement) on March 31, 2009. (R. 442.) After several follow-ups following the surgery, Dr. Keener noted on March 8, 2010, that Plaintiff "is very pleased with the pain relief and function that he has. He really doesn't have any pain, he says that occasionally he gets stiff and he can work it out by moving it." (R. 419.) Dr. Keener recommended "[a]ctivity as tolerated" and discussed lifting restrictions with Plaintiff. (R. 419.)

4

In January 2008, consulting physician Dr. Michael Nenaber completed a physical RFC assessment, finding that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, push or pull without limitation, stand or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (R. 367.) Dr. Nenaber opined that Plaintiff could occasionally climb, stoop, kneel, crouching or crawl, but never balance. (R. 368.) Dr. Nenaber reported that Plaintiff had limited reaching abilities, but had unlimited handling, fingering and feeling abilities, although Plaintiff was limited in reaching overhead with his right arm. (R. 369.) Dr. Nenaber found that Plaintiff had experienced medical improvement. Consulting physician Dr. Charles Kenney also completed a physical RFC assessment in September 2008, with nearly identical findings to those of Dr. Nenaber. Dr. Kenney found that Plaintiff could perform a limited range of light work. Dr. Kavitha Raman performed a consultive physical examination of Plaintiff in September 2008. (R. 335.) She found that Plaintiff had weakness in the left side of his body and shoulder pain. She also noted his history of seizures, headaches, depression, and anxiety. Consulting psychologist Dr. L.M. Hudspeth, Psy.D., completed a mental RFC assessment in September 2008. She reported that Plaintiff was newly diagnosed with depression and anxiety and had some relief with an anti-depressant. (R. 343.) Dr. Hudspeth noted that Plaintiff had mild to moderate limitations in understanding, memory, concentration, and persistence (R. 340), and mild limitations in social interaction and adaptation (R. 341). Dr. Hudspeth opined that Plaintiff was able to perform simple, routine tasks adequately. (R. 343.)

**2. Summary of Plaintiff's Testimony**

At the hearing before ALJ Flebbe (R. 568-614), Plaintiff testified that his seizure medicine, Dilantin, made him tired, and that he took a nap every day. Plaintiff testified that he was off seizure precautions and permitted to drive. He stated that he had headaches every day, and that the medicine sometimes helped but also made him sleepy.

Plaintiff also testified that, for four years prior to his right shoulder replacement, he could not raise his right arm above his head. After his surgery, he had better range of motion, but he had difficulty gripping with his right hand. Plaintiff also had back pain. He experienced

swelling in his right ankle, related to a very serious injury in 1999 when he severed the arteries, tendons, and nerves in his ankle. Plaintiff testified that he was depressed and had low self-esteem. He was taking medication for depression but did not think that it helped. Plaintiff also stated that he had problems with concentration and focus.

Plaintiff testified that an average day for him, in January 2008, consisted of getting up early, having coffee and watching TV for an hour, going back to bed for an hour or two. He would then get up and sometimes play with his granddaughter. After playing with his granddaughter, he would take a nap. When he woke up, he would watch TV. He did not do chores around the house. He would use the computer to play games a couple times per week. Plaintiff's friend would visit a couple times per month. Plaintiff testified that he could sit for a couple hours at a time, stand for a couple hours at a time, and walk a mile. He testified that he could lift 20 pounds with his left arm but nothing with his right arm. He would drive four to five times per week, usually just short trips.

### 3. Summary of the ALJ's Decision

In her decision affirming the agency's termination of Plaintiff's disability benefits as of January 1, 2008, ALJ Flebbe applied the eight-step evaluation process, enumerated in 20 C.F.R. § 404.1594(f), for determining whether an individual's disability has ended. (R. 14-21.) At step one,[1] the ALJ determined that Plaintiff had not engaged in substantial gainful activity from the time he was found disabled in March 2004 until the date on which his disability ceased, January 1, 2008.

---

[1] 20 C.F.R. § 404.1594(f)(1) ("Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).").

At step two,[2] the ALJ found that Plaintiff had the following severe impairments, as of January 1, 2008: "status-post astrocytoma with surgical resection, headaches, history of seizures, right shoulder arthritis, depression, status-post right ankle fracture and repair, history of lumbar spince surgery." (R. 15.) The ALJ determined that none of these impairments met or equaled an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1. The ALJ noted that Plaintiff's progress notes showed that surgery, chemotherapy, and radiation successfully treated Plaintiff's astrocytoma, and that MRI scans of Plaintiff's brain showed no recurrence of brain cancer. Because Plaintiff's records did not show recurrence or metastasis of his brain cancer, the ALJ concluded that Plaintiff's impairments did not meet or equal listings 11.05, benign brain tumors, or 13.13, malignant neoplastic disease of the nervous system. The ALJ next determined that, although Plaintiff had a history of depression, his symptoms of mild to moderate limitations did not meet listing 12.04. The ALJ also found that Plaintiff's history of right shoulder arthritis and arthroplasty did not meet or equal listing 1.02, because Plaintiff did not suffer from a major dysfunction of a joint in more than one upper extremity. Finally, the ALJ determined that there was no evidence that Plaintiff's pain following his lumbar spine surgery met or equaled listing 1.04, disorders of the spine.

At step three,[3] the ALJ concluded that Plaintiff had experienced medical improvement in his impairments, as of January 1, 2008. The ALJ reasoned that Plaintiff's impairments were less severe because the treatment of his astrocytoma was successful, Plaintiff no longer experienced

---

[2] 20 C.F.R. § 404.1594(f)(2) ("If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.").

[3] 20 C.F.R. § 404.1594(f)(3) ("If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).).").

seizures, and Plaintiff's headaches were partially controlled with medications. At step four,[4] the ALJ found that Plaintiff's medical improvement was related to the ability to work because Plaintiff's impairments no longer met or equaled the listings, as they did in March 2004. Because Plaintiff had experienced medical improvement related to his ability to work, the ALJ did not apply step five,[5] and, instead, moved to step six,[6] where the ALJ determined that Plaintiff had severe impairments, as of January 1, 2008.

At step seven,[7] the ALJ deemed Plaintiff to have the following residual functional capacity (RFC):

---

[4] 20 C.F.R. § 404.1594(f)(4) ("If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section . . . . If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).").

[5] 20 C.F.R. § 404.1594(f)(5) ("If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.").

[6] 20 C.F.R. § 404.1594(f)(6) ("If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521)" (portion of regulation omitted)).

[7] 20 C.F.R. § 404.1594(f)(7) ("If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.").

> [A]s of January 1, 2008, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except is limited to lifting and carrying 10 pounds occasionally and less than ten pounds frequently, sitting for 2 hours at a time for a total of 6 hours per day; standing for 2 hours at a time and walking one mile at a time for a total of walking and standing of 6 hours per day; limited to occasional climbing of ramps and stairs, balancing, stooping, crouching, crawling and reaching with the right upper extremity but no overhead reaching with the right upper extremity; no climbing of ladders, ropes, or scaffolds; no exposure to hazards such as dangerous machinery and unprotected heights; no walking over rough or uneven surfaces; no operation of foot controls with the right lower extremity; and the claimant has the ability to understand, remember and carry out work instructions learned within 30 days.

(R. 17.) In making this RFC determination, the ALJ determined that Plaintiff's subjective claims of limitations were not entirely credible. In support, the ALJ referred to Plaintiff's daily activities of watching TV, playing with his granddaughter, driving a car, and visiting with friends. The ALJ also noted that no doctor had imposed any specific work-related restrictions on Plaintiff, and that Plaintiff no longer had activity restrictions due to seizures. The ALJ noted that, although Plaintiff reported continued depression, he had not consistently sought mental health treatment. The ALJ concluded that, for the most part, she had accommodated Plaintiff's subjective claims of limitations in the RFC, but she did not include Plaintiff's need to nap one to four hours per day, as no doctor had recommended that Plaintiff needed to nap during the day.

The ALJ determined that, with this RFC, Plaintiff was unable to return to his past work. At step 8,[8] the ALJ determined that Plaintiff, as of January 1, 2008, could perform other substantial gainful activity as an addresser, information clerk, or surveillance system monitor. Accordingly, the ALJ found that Plaintiff's disability ended as of January 1, 2008.

---

[8] 20 C.F.R. § 404.1594(f)(8) ("If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education, and past work experience (see paragraph (f)(9) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.").

## II. Legal Standard

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's findings with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). Instead, the Court must affirm the decision to deny benefits if the ALJ correctly applied the law and supported the decision with substantial evidence. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Stated differently, if reasonable minds could differ as to whether Plaintiff is disabled, the Court must uphold the ALJ's decision. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

Here, the issue for the Court is whether substantial evidence supports ALJ Flebbe's determination that Plaintiff's medical impairments improved enough that he was able to engage in substantial gainful activity as of January 1, 2008. *See* 42 U.S.C. § 423(f)(1). The Court considers Plaintiff's condition as of January 1, 2008. *See Johnson v. Apfel*, 191 F.3d 770, 774 (7th Cir. 1999) ("[T]he ALJ will consider a claimant's condition at the time of the cessation determination, not at the time that the appeal determination is being made."). In making this determination, however, the Court considers all evidence in Plaintiff's file, *see* 42 U.S.C. § 423(f), that is, evidence from both before and after January 1, 2008. Evidence from after January 1, 2008, is relevant to the extent that it shows whether Plaintiff was disabled as of January 1, 2008. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 306 (3d Cir. 2012) ("[E]vidence acquired after the cessation date can nonetheless be relevant for the purposes of determining the individual's capabilities *on* the cessation date."); *McNabb v. Barnhart*, 340 F.3d 943, 945 (9th Cir. 2003) ("The district court was required to consider all of the evidence available at the time of the ALJ's hearing to evaluate the plaintiff's claim that he had a . . . disability as of the cessation date."). If the evidence shows that Plaintiff was able to engage in substantial gainful employment as of January 1, 2008, but then became disabled again at some time after January 1, 2008, Plaintiff's remedy is to file a new application for disability benefits, as the only question for this Court is whether he was disabled as of January 1, 2008. *See Hagans*, 694 F.3d at 306 ("[T]he ALJ's role in a Social Security cessation proceeding is to

review the SSA's determination that a benefits recipient was not eligible for benefits as of a certain date, not to determine whether he might have become eligible at some later time."); *see also Johnson*, 191 F.3d at 775.

### III.  Discussion

Plaintiff raises several claims of error, which the Court construes as follows: (1) Plaintiff's impairments met or equaled a listing as of January 1, 2008; (2) the ALJ erred in discounting Plaintiff's credibility; (3) the ALJ ignored the vocational expert's testimony that Plaintiff could not engage in competitive employment; (4) important medical records are missing from Plaintiff's SSA file; (5) the ALJ used reports from doctors who never examined Plaintiff; and (6) Plaintiff's conditions have worsened since January 1, 2008.

### A.  Plaintiff's Impairments and the Listings

ALJ Flebbe analyzed whether Plaintiff's impairments met or equaled listings 11.05, 13.13, 12.04, 1.02, or 1.04.  *See* 20 C.F.R. § 404, Subpt. P, App. 1.  Substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal Listings 12.04, 1.02, or 1.04, as of January 1, 2008.  Plaintiff's mild to moderate anxiety and depression do not rise to the level contemplated by listing 12.04, affective disorders.  Listing 1.02B, major dysfunction of a joint, requires evidence of loss of function in both upper extremities, and Plaintiff's pain is confined to his right shoulder.  Likewise, Plaintiff's lower back problems are not of the severity required for listing 1.04, disorders of the spine.

However, the ALJ erred in analyzing whether Plaintiff's brain tumor continued to meet Listing 13.13A as of January 1, 2008.  ALJ Flebbe's analysis was as follows:

> As noted above, progress notes from the claimant's treating neurosurgeon reveal his astrocytoma was successfully treated with surgical resection and chemotherapy and radiation.  Progress notes in 2007, 2008, and 2009, reveal that his MRI scans of the brain are stable with no sign of progression or recurrence of the disease of tumor. There is no evidence that he currently meets a listed impairment at 11.05 or 13.13, as there is no evidence of metastases or recurrence.

(R. 17.) Listing 13.13A[9] provides:

> A. Central nervous system malignant neoplasms (brain and spinal cord), as described in 1 *or* 2:
> 1. Highly malignant tumors, such as medulloblastoma or other primitive neuroectodermal tumors (PNETs) with documented metastases, grades III and IV astrocytomas, glioblastoma multiforme, ependymoblastoma, diffuse intrinsic brain stem gliomas, or primary sarcomas.
> 2. Progressive or recurrent following initial antineoplastic therapy.

Listing 13.13A (emphasis added). It appears that the ALJ read Listing 13.13A to require that Plaintiff's impairments meet *both* 13.13A (1) *and* (2); thus, the ALJ concluded that because records from 2007, 2008, and 2009 showed that Plaintiff's tumor was not progressive or recurrent following initial antineoplastic therapy,[10] Plaintiff's impairments no longer met or equaled Listing 13.13A. However, because a malignant neoplasm satisfies Listing 13.13A when it is either (1) highly malignant *or* (2) progressive or recurrent following therapy, Plaintiff's diagnosis of a highly malignant tumor, a grade III astrocytoma, meets listing 13.13A, no matter if his tumor was progressive or recurrent following initial antineoplastic therapy. Thus, the ALJ erred in her analysis of whether Plaintiff's impairments met or equaled Listing 13.13A.

Importantly, however, a highly malignant tumor does not continue to meet Listing 13.13A indefinitely. Listing 13.00 instructs, regarding malignant tumors,

> [W]e will consider an impairment(s) that meets or medically equals a listing in this body system to be disabling until at least 3 years after onset of complete remission. When the impairment(s) has been in complete remission for at least 3 years, that is, the original tumor or a recurrence (or relapse) and any metastases have not been evident for at least 3 years, the impairment(s) will no longer meet or medically equal the criteria of a listing in this body system.

---

[9] As explained above, the SSA determined in March 2004 that Plaintiff was disabled because his malignant brain tumor, a grade III astrocytoma, met listing 11.05A, the listing under which malignant brain tumors were analyzed at that time. Malignant brain tumors are now—and were, as of 2010, when ALJ Flebbe issued her decision, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2010)—analyzed under listing 13.13A, central nervous system malignant neoplasms (brain and spinal cord). The Court does not analyze Plaintiff's tumor under 11.05, benign tumors, because Plaintiff's tumor was not benign.

[10] "Antineoplastic therapy means surgery, irradiation, chemotherapy, hormones, immunotherapy, or bone marrow or stem cell transplantation." Listing 13.00B3.

Listing 13.00H2. It does not appear that the ALJ considered, pursuant to Listing 13.00H2, whether and when Plaintiff's grade III astrocytoma entered complete remission. To support the ALJ's determination that Plaintiff was no longer disabled as of January 1, 2008, the evidence would need to show that Plaintiff's complete remission began by at least January 1, 2005. Thus, although the ALJ noted that records from 2007, 2008, and 2009 showed no progression or recurrence of Plaintiff's tumor, these records are insufficient to establish that Plaintiff was no longer disabled as of January 1, 2008. It is not clear when Plaintiff entered complete remission. For example, in October 2005, Dr. Dold reported some concern as to whether Plaintiff's latest MRI showed progression of Plaintiff's tumor. (R. 471). Accordingly, this case must be remanded for the ALJ to determine whether and when Plaintiff's astrocytoma entered complete remission. The ALJ should also consider, consistent with the regulations, any limitations caused by the therapy Plaintiff has undergone for his brain tumor. *See* Listing 13.00H3.

**B. RFC and Credibility on Remand**

It is possible that the ALJ may determine on remand that Plaintiff's complete remission did begin on January 1, 2005, and, therefore, that his brain tumor no longer met Listing 13.13A as of January 1, 2008. In that case, the Court directs the ALJ to reconsider Plaintiff's RFC determination in light of an error in the ALJ's credibility assessment.

Plaintiff testified that his seizure medicine, Dilantin, made him "extremely tired" and that he "generally take[s] a nap every day." (R. 576.) Additionally, Plaintiff testified that he woke up with daily headaches, and that on days when his headaches did not respond to a normal dose of pain medication, he took a double dose, which made him very tired. (R. 577-78.) The ALJ discounted these allegations, finding that "[t]he objective medical evidence does not support restrictions in excess of those in the RFC, for example, the claimant's contention that he must sleep or at least lie down one to four hours a day. No treating or examining physician has recommended such limitations." (R. 19.)

13

Courts generally afford substantial deference to an ALJ's credibility determination unless it is patently wrong. *See Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993). The ALJ's analysis of Plaintiff's credibility was patently wrong because she discounted Plaintiff's testimony about the side effects of his medication based solely on the absence of corroborating objective medical evidence. This analysis is at odds with SSA regulations, which instruct, "[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). Furthermore, the medical evidence corroborated Plaintiff's testimony; Plaintiff asked Dr. Mandhan in January 2010 if he could stop taking Dilantin because it made him tired (R. 522), but both Dr. Mandhan and Dr. Dold indicated that Plaintiff would need to remain on Dilantin indefinitely because of the risk of seizures (R. 522, 555).

Therefore, if the ALJ, on remand, proceeds through the evaluation process to the point at which he or she must determine Plaintiff's RFC, the ALJ should reconsider the credibility of Plaintiff's allegations regarding the side effects from his medicine.

## C. Vocational Expert Testimony

Plaintiff also argues that the ALJ erred in ignoring the vocational expert's testimony that someone who missed two or more days of work per month would not be able to engage in competitive employment. (R. 608) The ALJ did not mention this testimony, likely because she found that Plaintiff's impairments would not cause him to miss two or more days of work per month. Because the Court has already directed the ALJ to reconsider whether Plaintiff's impairments meet or equal a listing and, if the ALJ continues on, reevaluate Plaintiff's RFC, in light of Plaintiff's subjective allegations, the Court need not address Plaintiff's vocational expert argument because it ultimately boils down to an assertion that the ALJ's erred in assessing Plaintiff's RFC. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).

### D. Plaintiff's Remaining Arguments

Plaintiff's remaining arguments are without merit. The Court finds no prejudice from any evidence missing from Plaintiff's file regarding his shoulder, ankle, and back. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (Court will only reverse for missing records where omission was prejudicial). Nevertheless, Plaintiff can certainly submit this evidence to the ALJ on remand. Next, although Plaintiff maintains that the ALJ ignored evidence of Plaintiff's back, shoulder, and ankle pain, the ALJ did note Plaintiff's pain in these areas (R. 19) and limited Plaintiff to sedentary work, with additional restrictions in the RFC for Plaintiff's shoulder and right ankle pain (R. 17-18). Plaintiff also disputes the ALJ's use of reports from doctors Plaintiff never saw. SSA regulations permit the ALJ to use the reports of non-examining physicians who do not personally meet with a claimant but, instead, review the claimant's medical record. 20 C.F.R. § 404.1527(e). Finally, Plaintiff explains in his response brief that many of his conditions have worsened in recent years, including a recent heart attack and a pre-cancerous colon polyp. The Court reminds Plaintiff that the only question before this Court, and that will be before the ALJ on remand, is whether he was still disabled as of January 1, 2008. If Plaintiff's condition has worsened and he believes he is eligible for disability benefits, he must file a new application.

### IV. Summary

For these reasons, the Court recommends that Plaintiff's Motion for Summary Judgment **(#17)** be **GRANTED** and that the Commissioner's Motion for an Order Which Affirms the Commissioner's Decision **(#20)** be **DENIED**. The Court recommends that this case be remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g), so that the ALJ may (1) reconsider whether Plaintiff's brain tumor met or equaled Listing 13.13A as of January 1, 2008; and, (2) if the ALJ finds that Plaintiff's brain tumor no longer met or equaled Listing 13.13A as of January 1, 2008, reevaluate Plaintiff's credibility and, accordingly, his RFC.

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within 14 days after being served with a copy of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTERED this 22nd day of January, 2013.

                                                s/DAVID G. BERNTHAL
                                       UNITED STATES MAGISTRATE JUDGE